The next case today is Patricia McIntyre v. RentGrow, Inc. Appeal No. 21-1637. Attorney Sumilis, please introduce yourself for the record and proceed with your argument. May it please the Court, good morning. My name is John Sumilis, or the appellant Patricia McIntyre, and Judge Lynch, I would please like to reserve three minutes for rebuttal. You may have it. Thank you. This morning, Ms. McIntyre seeks reversal of the trial court summary judgment ruling, in this case which alleges reckless noncompliance with the Fair Credit Reporting Act, or FCRA. Our position is straightforward. Under the Supreme Court's decision in Safeco v. Burr, where the FCRA statutory duty at issue is clear, as in this case, the duty was clear, or where there is authoritative guidance from the main regulator that might have warned the consumer reporting agency away from the view it took, and, again, in this case, there is such guidance, summary judgment for the agency is not appropriate. In our view, the trial court below misapplied the standard applicable to FCRA willful violation cases, such as this one, and a set forth in Safeco v. Burr. The Safeco decision begins by asking the basic question, is the statutory duty at issue clear? It goes to the heart of willful violations. Has the defendant been put on fair notice, warning that its noncompliance may be willful? In the Safeco case, the court tells us there's a major ambiguity in the word increase of insurance premiums, where the insurance company thinks an increase is from one level to a higher level for an existing client, but the statute, the court tells us, reaches the initial quote of a premium to a client with no previous relationship. So the very first quote could be an increase. Safeco had a common sense reading of the statute, and there was no guidance otherwise. So the Supreme Court said, well, this statute is so unclear, less than pellucid in the words of the court, that it would be unfair to find this actor in willful violation of the law. The court went on to say that that was not even a case where there was any guidance, that the actor had the benefit of guidance from the courts of appeals or the prime regulator. At that time, it was the Federal Trade Commission. The Supreme Court spoke in terms of authoritative guidance, didn't it? So the initial line is guidance from the courts of appeals or the prime regulator. The very next line is that there was no authoritative guidance from the regulator at that time. Well, one would assume that guidance from a court of appeals is always, if it's on point, is always authoritative. But since there's no court of appeals guidance on point here, we don't have to debate it. So I would agree with both of those points, Your Honor, that court of appeals guidance could always be assumed to be authoritative and there is no on point court of appeals guidance. But we do think that there is authoritative on point regulatory guidance from the prime regulator. But there's no question that the CFPB is now the prime regulator. Counsel, could you explain exactly what document you are relying on and why you think that provides authoritative guidance? Yes. Yes, Your Honor. The document at issue is the 2015 supervisory highlights issued by the CFPB and it's part of the record here. It begins at Appendix 1029. The guidance addresses the specific provision at issue in this case. I'm sorry. It doesn't say it's a guidance. It says it's a supervisory highlights. I understood it to be a sort of press release from the agency as to what it had been up to highlighting a certain activity. It certainly is not a regulation. It is not even a guidance. And it certainly did not go through any notice or comment rulemaking. So, again, how can this either meet the category of authoritative or meet the category of guidance? Yes. Yes, Judge Lynch. So, the enacting statute for the CFPB at 12 U.S.C. 5511 C-5 clearly provides that the agency is created for the primary purposes of issuing rules, orders, or guidance. This was not an order. It was not a rule. Therefore, we think by default it was guidance. I beg your pardon. That's all they can issue? They can't issue press statements? They can't issue something that isn't an order, a rule, or a guidance? You think that's an exclusive listing of what the agency can do? No, Your Honor. We think that's the primary purpose of the agency. But I think there's more to explain. But what makes you think that these supervisory highlights are an exercise of a primary purpose? I mean, the agency itself has warned that these can't be separated from their specific facts. So, certainly, the agency could issue press releases or other statements. However, we do think that the 2015 supervisory highlights are guidance because they are listed on the homepage of the agency that specifically says this is where we list our guidance. Also, the document itself in the conclusion on page 1057 of the appendix states this is a primary way in which we communicate to the regulated industry as to what our guidance is. The Supreme Court doesn't tell us very much about what guidance constitutes. But it clearly cannot be an order or a regulation. It would have said that if it required something more formal. It comments in footnote 19 in the Safeco decision that it can't just be a single staffer at the agency writing an opinion letter to a single regulated entity. But these are agency-wide publications with the express purpose of providing guidance to consumer reporting agencies. Let me back up. You say it's the homepage of the website. And on the website, they say they will list guidance. So, are there other documents that are labeled guidance? Four minutes remaining. The website, the homepage, specifically says we will provide regulatory guidance and compliance resources. This is one of the documents listed. There are several other documents. And I appreciate the police position that the agency issues quite a bit of guidance. However, this is not some well-kept secret. You're not answering my question. Are there other things that are published that have the word guidance somewhere in the title or the first paragraph? To be sure. And those are absent from this particular document. Well, this document is different from certain other documents the agency publishes that it also calls guidance. But I don't think that that's evidence that this particular document, the 2015 supervisory highlights, do not amount to guidance. And we do think that this is very relevant guidance at a time that this entire industry, the background screening industry, is facing 30 enforcement actions by attorneys general, more than a dozen class action lawsuits about this very issue. The use of vendors to provide public records on background reports without proper supervision or auditing of this vendor. So we think this is a very relevant piece of information from the CFPB that amounts to what we think is agency-wide authoritative guidance. Let me pivot, if I might, also. I'm having trouble following this sort of in the abstract. And part of it's not your fault. Part of it's the difficulty of reading SAFCO. But don't we, I mean, clearly they didn't put this, they didn't generate this document, draft it, publish it, put it on their website for any purpose other than trying to guide regulated entities out there. Why else do it? The question, though, is so what significance is it to the regulated entity under SAFCO's analysis? SAFCO tells us what one example of something that wouldn't be enough. And then it tells us other things that are missing. But it doesn't tell us exactly what's necessary. Isn't the answer that we need to take a sort of totality of the circumstances analysis? We need to look at the statutory text. If that's completely put in clear, end of inquiry. But if it's not, then we have to step back and say, given that language, given that context, and given what guidance is available, is this enough to put someone on notice that an otherwise objectively reasonable reading isn't reasonable? Why don't we go at it that way instead of getting into this pigeonhole game of what's authoritative and what's not? Just Kayada, we think this is the correct approach to SAFCO. As I said at the beginning, when you say this, what do you mean? The complete approach of beginning with the statute and determining whether the statute is clear. And if it's not clear, like SAFCO, there is something else you could look to, such as a court of appeals decision or authoritative guidance. But we could begin there. And in this case, unlike SAFCO, there's no dispute that the statutory provision is clear. In fact, at pages 19 and 20 of their appellate brief, Renfro concedes clearly in this appeal that the provision here is a clear one. It gave it fair warning and fair notice that it had to assure accuracy every time, whenever it prepared a consumer report. And that's regardless of whether it used a vendor or not a vendor in gathering these eviction records. Tell me what language you're – because I'm aware of the language that requires them to follow reasonable procedures to assure maximum possible accuracy of the information. Yes, Your Honor. I think the beginning of that statutory subclause is whenever a consumer reporting agency prepares a consumer report. So we think whenever means every time it prepares one. It should follow these reasonable procedures, and we think the statute is very clear, as in the Cortez case in the Third Circuit, the Syed case in the Ninth Circuit, where the statute was clear. We believe that the notice is also clear and a willful violation is possible. But the problem here is that this is a different type of case than SAFCO. In SAFCO, there were two conflicting, both reasonable interpretations of the statute, and SAFCO followed one of them. Here, the statute is clear, but there is an open question as to what is or is not reasonable under the circumstances. And the question in this case is going to boil down to unwillfulness, whether or not there was anything that we can take cognizance of that should have warned off the agency, credit agency, about using the procedures that it used. And you say, oh yeah, they should have checked more closely and should have policed their vendor more closely. And they say they shouldn't, and what I'm struggling with is what is there out there that should have warned them off? And the only thing you've pointed to so far is the supervisory highlights. And let's put it this way, you haven't got me on that one yet. Is there anything else that goes your way other than these supervisory highlights? Your Honor, I would agree that the reasonableness or unreasonableness of not supervising or how they supervised in order to this vendor is the issue in this case. But we've pointed to no less than five circuit court decisions and footnote four of our reply brief, which state that that's a jury question. That's not a summary judgment question. Reasonableness is always a jury question so long as there is a certain minimum of evidence. There has to be something that would allow a jury to find either way. So there's got to be some evidence in this case, some competent evidence, which would allow a jury to find unreasonableness. And that's what I'm struggling to see in this case based on the circumstances as they existed at the time. Your Honor, to answer that question, we believe the statute is clear that every time a report is prepared, there should be maximum possible accuracy. No, there should be reasonable procedures aimed at achieving maximum possible accuracy. The statute isn't an absolutist statute that says you should always achieve maximum possible accuracy, whether we can reasonably expect it or not. It's a reasonable procedure statute. And so there's got to be some evidence in the summary judgment record from which a jury could find that the procedures that this credit agency used were unreasonable. And that's what I'm, so far, the only thing you've told me they could look at is the supervisory highlights. And I'm, you can call me dubious about whether that's enough. Your Honor, we certainly agree that that's the issue. It's the reasonableness of the procedures to assure accuracy. And we think just looking at the statute itself, which is clear, without even referencing the supervisory highlights, creates a genuine issue of fact. Because in this case, there's evidence that they chose to use a vendor that they did not need to use, never audited the vendor. Excuse me, I missed that. They chose to use a vendor that what? There was no statutory requirement to use a vendor in gathering these type of public records. No, but that is a common practice, and there's no case or other regulation that interdicts that practice. We agree. It's perfectly lawful, and they can do it so long as they supervise. It's not lawful. It's a reasonable way of proceeding. You may have to use some degree of care in choosing the vendor. Also, Your Honor, we would say some degree of care in supervising the vendor and auditing the vendor. It's a very old concept, respondeat superior, that you could be responsible for the conduct of your agents. And this is where we think the supervisory highlights are helpful, in that if there was some question, what do we need to do in this context, the agency had said, we see problems when vendors are unsupervised and unaudited, and in fact we ordered one of your competitors to implement supervisory procedures. And in this case, the evidence of record is that there were no such procedures. They had no idea how frequently the vendor went to courthouses to pick up records. One of Ms. McIntyre's records had been satisfied six years earlier, and they had never gone to pick that up. Another one had been satisfied for about five years. Also didn't pick that up until after the investigation revealed that it had been paid in full and that it needed to be updated. We have thousands of other cases that had to be updated because this vendor had not correctly provided the information in the first instance. So those are the type of issues that we think support a recklessness finding. But at the end of the day, those are arguments to the jury in our view, Your Honor. Safeco does not require a case to be taken away from the jury. Where the statute is clear, and the statute is clear here, we think in addition to that, these supervisory highlights are very helpful to a company like Renfro, excuse me, if it felt it needed help to determine what to do in this exact context. Let me ask you, you keep saying this should go to a jury. Safeco seems to instruct us that the preliminary inquiry here is an inquiry of whether something is objectively reasonable, and that that is an issue of law for this court to decide. It's only if we decide that their position, either because of the statutory text or because of other warnings that are sufficient to have made clear how that text should be read, only if we decide that it's not objectively reasonable, does the issue then of the greater fault of recklessness go to a jury. That's how I was reading it. And I think SuperValue reads it exactly that way as well. What do you point to that says that even the determination of objective reasonableness would be a jury issue? I'm sorry, Your Honor, if I suggested that. We read Safeco the same way as you just articulated it. In the first instance, the courts get to decide whether there's an objectively reasonable reading of the statute that a actor, in this case the agency, would have, like Safeco had, which justified its conduct no matter what that conduct was. In this case, however, there is no objectively reasonable reading that Renfro even proffers. In fact, they say the statute is clear. We knew we had to follow reasonable procedures to assure the maximum level of accuracy. And when we have the number of errors here just in McIntyre's own report, never mind other people, and a finding that the records were incomplete and inaccurate and had to be updated, we think that there is no reasonable reading that allows an agency to simply rely on those vendor records and to precisely copy them and convey them to its customers, but without any supervision, without any audit, without any sampling. We think it's just regular common sense supervising your agent, supervising your servant. You're talking as if the record shows that Renfro did nothing except simply pass them along, but Renfro took certain steps. You may think those steps are inadequate. Renfro separated out things that were obviously not concerning the person who they had asked the trans union to check on. They had a checklist of things they followed. They periodically surveyed what other reporting agencies were providing in the field and, in fact, came to a determination according to the record that the service provided by their vendor was the gold standard in the area. So they performed certain steps. They never audited the records, but the question is whether there's anything that requires them to do an audit or put them on notice that they should have done some type of audit. And the only thing I keep coming back to, the only thing you seem to point to, is this supervisory highlight. Where else do you draw this audit theory from? Your Honor, we do not believe that a reasonable agency would need the supervisory highlight to determine that in order to achieve accuracy, it must have procedures about the up-to-date nature of court records. The procedures they mentioned, which the trial court correctly dispensed with, are just simply irrelevant here. It's not a question of whether they matched the correct record to McIntyre. It's that it took them six years to get an update that the judgment had been satisfied. Five years to find out that another one had been withdrawn. A third one had been vacated, and they didn't pick that one up either. And the reason why these errors happen, in our view, is because they did not sufficiently oversee this vendor, and they did not audit them or spot check their up-to-date status of records. Now, the supervisory highlights help an actor in this area if they had questions. I chose to use a vendor. They give us public records. Is there a problem in this area? Should we take a closer look at it? And the supervisory highlights are one place. I think the 30 attorneys general's actions and more than a dozen class action lawsuits against some of their competitors, including the parent company of its vendor, about public records, such as civil judgments and tax liens, are the type of things that, in our view, a reasonable agency should be looking at to determine what's leading to these errors. And I think the highlights are helpful, but not the spots. Counsel, unless my colleagues have any further questions of you, you have reserved some time. Thank you, Your Honor. Okay. Attorney Semelis, if you could please mute your audio and video at this time, and Attorney Levenberg, if you could unmute and introduce yourself on the record to begin. Thank you, Your Honor. Keith Levenberg here for the appellee, Rent Grille. May it please the Court. Mr. Semelis opened his presentation asking, is the statutory duty at issue clear? But what he didn't address, at least not until the Court pushed him a little bit further into his presentation, is what he claims the statutory duty in this case to be. The theory that was put in the complaint was that there is some kind of duty for CRA to go to the courthouse and collect records themselves rather than relying on the vendor. And I think the Court correctly apprehended there's no such duty, and indeed the statute expressly permits agencies to report vendors furnished by other agencies. In the briefing, and there was some backpedaling from this in the presentation, they repeatedly used the expression blind reliance on the vendor, claiming that the duty is that there must be some level of formal auditing and supervision of the vendor on the basis of the so-called guidance in the supervisory highlights publication. But as I think Judge Estella correctly apprehended, that may be an interesting issue in some hypothetical case other than this one. It's not an issue on the record in this case. This, simply put, is not a case about blind reliance on a vendor. The record in this case is that the district court granted a summary judgment on evidence that RENCRO applies a filtering process to the data it gets from TransUnion. This process eliminated more than a quarter of the hundreds of thousands of court records provided by TransUnion across millions of screening reports. RENCRO does recurring, ongoing reviews of TransUnion and its other providers. It's reviewed TransUnion's data on multiple occasions, compared it to the competition, and concluded that TransUnion's data was superior and the gold standard. The parties can argue over whether that's enough, of course, but one thing it is not is blind. On top of that record evidence about how RENCRO routinely reviewed and compared the quality of TransUnion's data, there was further record evidence that it had never been sued or investigated before over these data. It had a very low dispute rate on the data it did get, just 2,900 eviction records disputed over those millions of screenings. And there was no record evidence at all that TransUnion's processes were themselves subpar. Let me ask you about that because that was puzzling me in the record, if you might. If we look at the record in this case, it was before the district court, what procedures, if any, did TransUnion follow to assure maximum possible accuracy of the information it gathered and provided? I'm not sure there's much of anything of that in the record, but I think that is Ms. McIntyre's problem rather than ours because it's their burden. It wasn't for lack of opportunity to develop that evidence is the important point. They actually took TransUnion's deposition in the case. It's a little tricky, so we've got a record. Let me ask you this. What does the record show regarding RENCRO's understanding of whether TransUnion had any reasonable procedures in place? I think there's a great deal of record evidence that RENCRO was very satisfied with the quality of the data that it was getting from TransUnion. And one of the main ways that it was monitoring this was that it knew what its dispute rates were. It knew that it was receiving a very low rate of disputes over this data. And we all know what would have happened if the rate was much higher, but it wasn't. And the district court correctly cited that on the basis of other circuit precedent as a factor in the willfulness analysis. Let me ask you about that, and that's helpful. How do we know that that dispute rate is high or low? Because we know that there were several millions of reports and several hundreds of thousands of those contained court records from TransUnion. So the dispute rate among those was that there were about 2,900 disputes that concerned eviction records. That had to be manually assessed. There were some other disputes about other kinds of records. But the relevant records here, there were 2,900 disputes. So that's higher than the death rate of COVID. So how do I know whether that percentage is, in this context, high or low? Well, I think it's actually quite lower. Because I think Ms. McIntyre labored very mightily below to use what the district court characterized as the wrong metric for comparison in reference to the dispute rate. I agree with you, but I'm asking, you're saying we should regard your metric as high or low. I agree that on a scale of 1 to 100, it's at the lower end of the scale. But I don't know if, in context, that's a lot or a little. Right. Well, I think it's very little. Is there any comparative evidence in the record? I apologize. Just tell me. Is there any comparative evidence? Do we know what the dispute rate is compared to competitors' dispute rate or the dispute rate of companies that are using other vendors who compete with TransUnion? I don't believe there has been anything put in the record on the dispute rates of competitors. But, again, we would regard that as a problem for the party with the burden as opposed to a problem for us. But what we do... That may be so, so long as you treat dispute rate as neutral or irrelevant. I agree with you. If there's no evidence, dispute rate can't be used to favor the party opposing summary judgment, but it also can't be used to favor you, favor your client. May I have a follow-up question? The disputes about court records could be because the reporting on the court record is inaccurate or incomplete. I take it the allegations here are that the reports were incomplete. It's true that there were judgments entered against the plaintiffs, but the record did not contain later information that those judgments had been satisfied. So there's inaccuracy in the sense of incompleteness. There are other types of inaccuracy. There are also inaccuracies in court records that are accurately reported. Is there any breakdown as to the types of disputes? Thank you for that question, Judge Lynch. It does give me an opportunity to address an important point, which is that there are many reasons a dispute can be raised, and the record being wrong in the first place is only one of those reasons. Disputes are often routinely raised, not because the record was wrong when entered, but because the facts have changed and they would like the report updated, which was in fact the case with one of the records at issue in this case. So that 2900 number is not the lower end of the number of possible errors with the records. It's actually the higher end of the number, because we don't know how many of those 2900 actually were complaining about something wrong, as opposed to something that needed to be updated. And against that numerator, we think the proper denominator is the millions of court records, the millions of reports, rather. Ms. McIntyre seemed to assume that the reports not containing court records are just irrelevant for purposes of figuring out how good TransUnion's data is. But if there was properly nothing to report, whether because there were no records or because there were records and TransUnion deemed them non-reportable, the fact that those reports were made without those records is an example of TransUnion getting it right and RentGrow in turn getting it right. You've mentioned the filtering process. That seems to be, the way you describe it, a procedure that your client employs to try to assure accuracy, depending on what it is. What does the record tell us specifically about what filtering is done and what criteria is used to do the filtering? I believe most of that is in the deposition testimony cited by the district court. It talks about trying to eliminate records that shouldn't be reported for a variety of reasons based on time period and other things, if it's determined that it belongs to somebody else. There are other criteria for records that shouldn't be reported, and I'm not quite sure how much detail there was on that in the record. But there was very specific detail about how many records that process had eliminated. It was a large number, over 100,000 records. When I say that, we're referring to reports with records. The actual number of individual records within those reports could be larger, but we were just talking on the level of reports. I do want to have a chance to address the authoritative guidance issue that has quite properly occupied the court's attention for the majority of Mr. Similis's presentation. I think it's a very easy answer, actually. We know that the remarks from the CFPB are not authoritative because the CFPB basically says they're not authoritative. It said in published regulations that they don't have the force and effect of law. It said in the supervisory highlights periodical itself, this document does not impose any legal requirements. It said in reference to the comments on the example cases it discusses that those examples are generalized, not binding on the public or agency, and whether or not the same standard applies anywhere else depends on those specific facts and circumstances. And I think that phrase, not binding, can actually be the end of the inquiry right there because SAFEco used the same language when it held that the proffered guidance wasn't authoritative because it wasn't binding. And I think, more importantly, that there actually is some authoritative guidance out there on what qualifies as authoritative guidance, beginning with those words not binding in SAFEco and also with the Van Stratten case that we cited in our brief. That addressed a very similar kind of publication, something that was much closer to a press release, to use Judge Lynch's example, than to binding guidance. It was a bulletin from the regulatory agency. And the court there said that it was not binding, not authoritative guidance under the SAFEco standard because it wasn't an exercise in notice and comment rulemaking and wasn't an adjudication. Here's what's puzzling about that, because when you read SAFEco, at least I find it puzzling. It leads to the conclusion that there is no such thing as guidance relative under SAFEco because to be binding on that agency, there would have to be notice and comment. So we're talking about rules and regulations. And if that's what SAFEco meant, was rules and regulations, you'd think the court would have just said it. Guidance generally is not binding on an agency, or at least most agencies. So it leads to a conclusion that SAFEco pointed us towards a term, guidance, which will never be found. Thank you, Your Honor. I think that question is very well stated, and I think it gets at what I think is the most charitable way to sum up Ms. McIntyre's argument here, which is that there is some fuzzy middle ground between an offhand comment and a rule and regulation that still qualifies as authoritative. And this may be more than an offhand comment. It's certainly less than a regulation. But I think the standard to apply is precisely the standard supplied and adopted in that Van Straten case, which is, is there anything binding about this? Is it an adjudication? And the answer to that is no. But there is also another standard that is expressed in SAFEco, which poses the question, did the defendant's conduct violate an objective standard? And we think the answer to that question is no, because when the CFPB says that under certain unstated facts and circumstances, some unnamed institutions needed to do more auditing and supervision of some unnamed vendors and expressly says this isn't binding on the public or the Bureau and its application to anybody else depends on their specific facts and circumstances, that's not an objective standard. It's a vague standard. And the context that's left vague actually matters. For all we know, those could have been situations where the CRA was a large player and the record source requiring supervision was a minor or emerging player, and it would be quite incongruous to turn that principle on its head and say a smaller business like Renfro is obliged to supervise or is even capable of supervising a big three behemoth like TransUnion. In that situation, you would expect that the examination that the record evidence shows that Renfro did here and to the reliability of TransUnion as a source and the quality of the data it's getting is sufficient to discharge its duty. Along the lines of what does SAFEco mean, binding on whom? Binding on the party being regulated or binding on the agency? We have other cases involving, for example, opinion letters from White House legal counsel's office and what effect they have on the agencies who receive those letters, whether those agencies are then bound to comply with the terms of those letters or not. So it seems to me that there may well be situations where agencies are bound by something other than notice and comment rulemaking. And your brother says they put guidance after they put notice and comment rulemaking. But I would have thought the binding has to do with the regulated industry that is forced to comply, has to comply with the requirements of the statute. Is there any guidance you can give us on that? Well, I think in this case, the CFPB's statements were very clear that these type of remarks are not binding on the public or binding on the agency. As to what it would take to be binding on the agency, I don't quite know what I would say there, but what I do find a bit puzzling is that Ms. McIntyre's position is that we're supposed to take the CFPB's remarks as binding and authoritative when it says this is what we did in a couple of cases, but we're not supposed to take the CFPB's remarks as binding and authoritative when it says don't take these remarks as binding. And I think the CFPB coming right out and saying that and being very clear that these examples are context-specific really should be the end of the inquiry. Thank you, Your Honors. Thank you. At this time, Mr. Levenberg, you should mute, and Attorney Sumilis should unmute, and he can reintroduce himself on the record for his three-minute rebuttal. Thank you. This is John Sumilis with just a couple of quick points in rebuttal. First, Mr. Levenberg mentions the statistics. What they say in their brief is that they have a dispute rate of 2.3% of civil records. The only point of comparison we really have is the Smith v. Lexis case, where they had a 0.2% dispute rate. The dispute rate here is 11 times greater. So if that's a point of comparison, that's what we have to compare it to. I do think that number is also not spot-on, because among the civil records, we don't know how many of those reports had eviction records. So I don't think it tells us very much about their overall view of accuracy of eviction records, because if, say, half of those reports didn't have any evictions, well, there would have been nothing to dispute, and therefore that figure could be 20 times higher or 30 times higher. We simply don't know. Mr. Sumilis, could you address what, as I understand, part of the argument on the other side, is that the statute requires that they follow reasonable procedures. Here are the procedures Rencro says it files. We deal with a major bona fide experienced supplier. We then sift through and knock out a bunch out that we determine are irrelevant or not, and we pay attention to our dispute rate. So they say those are our procedures. What do you think of them? And what do you point to in either the statute or even in the supervisory publication there that would allow us to say that those procedures are objectively unreasonable? Right. Well, the burden that we have is to show that they fail to follow reasonable procedures to assure accuracy. Well, we show that the relevant procedures here are not whether they match them to the correct consumer. That has nothing to do with this case. It has nothing to do with whether they use a vendor or not. Stay with that. I would think you'd be bringing the changes if they hit your client with something having to do with someone else and put it on her report. So it does seem that that is a procedure to get their final action accurate. But my question isn't whether you think it's reasonable or not. It's what do you point us to, never mind whether it's guidance or authoritative or not, what do you point us to from the agency or from Congress that would allow us to say that those procedures that they've touted are objectively unreasonable as a matter of law? Your Honor, we think that we proffer evidence that under those procedures, the errors at issue in this case, there could be other errors as well, such as mismatching errors, but the errors of not picking up withdrawals of court cases, satisfactions many years later, vacature orders, there's no evidence that they're following any procedures that achieves that level of accuracy because it didn't in Ms. McIntyre's case or in any of the relevant populations. So therefore, we think to have a procedure in place like the court in the Third Circuit in Siemens and the Sixth Circuit in Boggio tells us it's a procedure that leads to this inaccuracy that could underpin an unreasonable reading of the statute. And at the end of the day, SAFCO says you could get summary judgment if you have a reasonable reading. And what we didn't hear from Mr. Levenberg is any reasonable reading in this case. We heard a lot of facts, but we think those are jury arguments, not summary judgment arguments. Okay, thank you very much. Thank you. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you should disconnect from the meeting.